Good morning, Your Honors. Jesse Agatstein, Federal Defenders, on behalf of Mr. Tovar-Duran. This case is about what happens when the government has never searched its existing file of I'm 1015 Facebook group evidence for whether its witnesses participated in that group. It also concerns a hearsay within hearsay error for using two documents, warrants of removal and warnings to those removed for their assertions that someone else had found Mr. Tovar-Duran to be an alien. For both these reasons, this court should remand to the magistrate judge for further proceedings. So on the first point, I want to be very clear that the government has never looked to see whether its three testifying agents appear in a data set of I'm 1015 Facebook posts, likes, shares and comments that it said under oath elsewhere that it has and which public reporting confirmed it had at the time of Mr. Tovar-Duran's trial. The evidence in this record was that the prosecutor had told defense counsel the morning of trial that two of its three witnesses did not recall posting anything, did not recall any specific posts they liked. So the proper remedy here is for when the government has a file of documents it has not looked in that could contain impeaching material, this court should conditionally vacate. If it doesn't have the material, the magistrate judge simply reinstates the conviction. So we'd ask this court to do that here. So was this a case like Bernal-Sanchez where they merely searched for a conviction as opposed to whether or not they were actually involved in the Facebook account and actively? Exactly. So the government did a limited search and this is after we published Bernal-Sanchez. I guess that was a mem dispo. So maybe we should publish so that in all the upcoming cases involving these people who are on this Facebook page, the government will know they have to do this. I guess we didn't go far enough in Bernal-Sanchez. Yeah, we'd ask this court to make clear that that's the case. Counsel, I want to ask you about your representation that this is the facts of this case are on all fours with Bernal because there it was undisputed that the government possessed information about the 10,000 open investigations into the group and did not search for it. Here, and I'm looking at ER-159, I think it's a little different where what the government said is that it learned about the agents membership and the two of the three agents membership in 10-15 and ran their, and I'm quoting here from ER-159, and ran their Hentorn checks which came back clean. Given that the agents reported that they did not like or post and they cleared their Hentorn checks, there was nothing else regarding the Facebook group in the United States possession to turn over to the defense. So it sounds like here the facts are different that it isn't the same issue where there was no search done. The government represents that it possesses no further information. So how is it to prove a negative if it looked, it has found nothing, and the reason that it ultimately disclosed before trial the two of the agents were members in this group is because they self-disclosed that they were members but that they hadn't liked or posted anything in the group. So two answers to that, Your Honor. First, that was the same situation in Bernal-Sanchez where the government had done Henthorn checks, but because investigations were still open and had not hit individual personnel files until about, so Mr. Tovar Duran was tried in February 2020. The investigations remained open and did not hit individual personnel files until June 2020. So that's one answer, and the same thing was true in Bernal-Sanchez. The other thing is there's more information the government has that does not go to individual personnel files. Like what? Like whether someone was a member of I'm 1015, for example. The declaration we submitted and that was submitted in Bernal-Sanchez made clear that only about 130 Border Patrol agents had any sort of investigation opened into I'm 1015 despite about 10,000 of them being. Are you arguing that the government had an obligation to get a search warrant or to do some additional investigation with respect, because these individuals, these two agents disclosed that they were members? Yes. No, definitely no. They did not have to do any sort of affirmative investigation they hadn't done, but they do have an existing data set that is far from the full amount of what was in that Facebook group, but is what they collected, and it would be relatively simple to search that existing data set that CBP has, and that's what this court ordered it to do in Bernal-Sanchez. Okay, so let me ask you this. You would agree that there's nothing in the record suggesting that Agent Copenhaver was involved in the Facebook group? That's correct. Okay. So maybe you can turn to the harmless error argument here, because it seems to me that if there's testimony from Agent Copenhaver that supports the conviction, why isn't this a case that can be resolved on harmlessness? So that's generally, this court's approach is that it can be resolved on harmlessness once the evidence is disclosed before the magistrate judge. So this court has in many cases followed the principle of Pennsylvania v. Ritchie, which is when there's Brady evidence that has not been searched for or not disclosed, this court's practice is to But you just agreed that there is no question about whether or not this particular agent was involved in the Brady violation. No. To be clear, there's nothing in this record indicating that he was. The government has never searched its files to see if he was. It's relying on his self-report, which this court explained in Bernal-Sanchez is not a full Brady search of its existing information. But regardless, the proper procedure is to conditionally vacate the conviction for the government to do the search. And that's what it's done in Doe, Alvarez, Mooney's-Hawkins, Bernal-Lobezo, Budziak, Stever, all following Pennsylvania v. Ritchie. And I'll note that Judge Christen's dissent in Bernal-Sanchez relies exclusively on federal habeas cases reviewing state convictions, where the justification for doing the harmlessness analysis in the first instance on a Brady issue is very different than on direct appeal. And in that case, the case Judge Christen relies on, everybody already had the Brady evidence. It had been disclosed. And so that's how I would distinguish those two. I'm happy to address any questions this court has on the second issue. It's unusual to use these two-form immigration documents to prove someone is a quote-unquote alien. They come in for many other purposes regularly in illegal reentry cases, but they're sort of like relying on a marshal's form that a person was arrested to prove underlying probable cause. Theoretically, you could do it. You would have to show another layer of hearsay, which the government did not do here. So for that reason, too, we'd ask this court to remand for further proceedings. I'll reserve the remainder of my time. Great. Thank you. Good morning, Your Honors. May it please the Court. Peter Horn for the United States. I want to focus my comments on the 1015 discovery issue, but to address just briefly where my friend on the other side left off, what Tovar Duran describes as an exceptional or unusual use of these removal documents is, in fact, plainly authorized by this Court's precedent in case after case involving exactly the same type of documents. And the documents here were not used for a separate hearsay within hearsay. So would you agree with the statement from opposing counsel that this case is on all fours with Bernal? I would not. And at least for four reasons. And going first briefly to Judge Warlaw's question about that, this is not a case where there was a limited search. This was a case with a full, per usual, Hanthorne check on the agents, each of the agents. There was inquiry made, Giglio questions put to the agents. And so it was not some limited search. The government followed all of its obligations and procedures to check for potential impeachment information. And the extent of it was that two of the agents were members, but nothing more. There's no more information there. Which two were, which two identified? The two are Agent Artiles and Agent- Were they identified before, in trial? The record isn't clear if they were identified at the time of trial. Would they disclose to opposing counsel? That's not apparent from the record. What we know from the record is that at least by the time- Were you the trial counsel? I was not. Because I think that the situation is that, I think the Hanthorne search of the personnel file is insufficient if the investigations are pending. And we don't know what the investigation found yet. So all you're relying on is just the agent who could not be telling you the truth. They're self-reporting about whether they were in the group or not in the group. But it would be, I don't know. I mean, I don't know what further documents there were. That's why I think that you're opposing counsel is asking for conditional vacations so that you could look, you know, the prosecution could look more intensively at whatever information is available to it, disclose, and then we'll do the harmless error analysis. Or the trial court will. Understood. I can understand my friend's position. And this goes to Judge Desai's question earlier about the Hanthorne check that was conducted here. That was a proper check. And importantly, and I think this is where my friend is mistaken, it doesn't just search for convictions. It doesn't just search for final dispositions. This is a check for potential impeachment information of any nature, including pending investigations and disciplinary actions. And this goes to your question earlier to my friend Judge Borla about whether this happened after Bernal-Sanchez. No, it did not. And in fact, this case predates, the arrest in this case predates by a couple months, the arrest in Bernal-Sanchez. The trial here happened in early 2020, over six years ago. And the appeal in the district court, nothing was filed by Tovar Duran for close to four years. And so, by the time it got to the district judge, it postdated the Bernal-Sanchez disposition. At trial, at the time of the Hanthorne checks, no. And in terms of the declaration by Ulmer and the data set that was compiled as of June 2020, that timing is important to consider. And I want to give some other context to that because at the time, I think you said that there were four points that you would make to distinguish this case from Bernal. And I think I only got down one and perhaps I missed the other three, but you said there was no limited search like in Bernal. So what are the other three distinguishing factors? No limited search. The second is to clarify that this case did not happen after Bernal-Sanchez to correct that issue. It's also different to the extent that there were full Hanthorne checks run appropriately at the time. I think it was in that case, too, but I do want to clarify the record here. And then I'd say third and fourth or fourth and fifth, the court in Bernal-Sanchez appeared to assume that there was more information there, that there was some other discovery. And that's what's apparent from the language of the disposition. This argument's a little circular, don't you think? Because if the government just says there's nothing there but it's not complying with its Brady obligations, then it sounds to me like what you're saying is that that should end the inquiry and there needs to be something more to indicate that the government is actually hiding information when, of course, the defense doesn't have any ability to know that or confirm that. There's no basis or obligation for us to disbelieve agents and conduct some further investigation based on or in spite of the representation. That's just, that doesn't exist under this court's precedent under Supreme Court law. So that's in one respect. The second is this is done in conjunction with Hanthorne checks that check the agency's files for all the information that's there. And this, going back to the timeline briefly, at the time the Hanthorne checks would have been done here, the agency was in possession of information about 1015, including agents who were. What I don't understand is why, if that's true, why did the government only disclose at the last minute that these two agents were involved in the real CBP nation and I'm 1015? Like, if you had that information and had verified, according to your Brady obligations, that they were not in it, why didn't you say it earlier in the proceedings instead of waiting till the last minute to come and say, oh, two, the three were involved? And that, that goes to how the record shows that the original representation was that neither agent, the original representation of motions eliminated, neither witness was involved in the group. None of the three. And by the time, by the time of trial, two of the three were. And what this. But they were all along. They weren't just, they didn't just become involved in something that was already being investigated. That's completely inconsistent representations to the court. And if you were complying, if your prosecutors were complying with Brady all along, then they would have been able to determine that earlier, wouldn't they? I can understand you're reading the record that way. What it reflects, in fact, and I've talked to the trial lawyer, the trial lawyer will say about this. What it reflects is a determination over time about who the government's witnesses will be. And so one essential witness here is Agent Copenhaver. He's not a member initially, not a member at the time of trial. What there was over time is a shift in who the government's trial witnesses would be. And what that. I find that representation now lacking credibility. It just, it seems to me that you, especially by that time, you had Bernal Sanchez and you knew you had thousands of agents involved in this racist group. To go to that point, at that time, this happened in February 2020 before, and that was a few days after Bernal Sanchez was arrested, before Bernal Sanchez's trial and years before the Bernal Sanchez disposition by this court. Well, I mean, at the time of Bernal Sanchez's trial, I remember reading newspaper articles about this group. Everybody knew about this group. Understood. And that's exactly, that's exactly to my point about the agency had information available to it. The Henthorne checks here would have turned up and they didn't. But they didn't in Bernal Sanchez either. And the result is that there was nothing there. And the conviction. Why are you fighting so hard against a conditional remand? Why isn't the government's interest in finding out the truth? Our position is the steps taken here are compliance with the discovery rules, Henthorne, Brady, Giglio. Those did take all appropriate steps to find out the truth. And we believe we we have by taking those steps here, not meaning to fight, fight discovery obligations. We embrace them. You didn't do it in a timely way. Even in this case, you didn't do it in a timely way. In fact, I would respectfully disagree that it was in a timely in a timely fashion before trial. The appropriate disclosures were made before trial. And to return briefly to Judge Desai's question a few moments ago about the reasons, it's distinguishable. Again, the panelists seem to assume that there was some information there. Here, there's no indication there is. There's nothing else in the government's possession. And that's an issue for Mr. Tovar-Duran with each authority he cites in all of those arguments, because in all of those cases, there was. You're out of time, but I have a question that I want to make sure I get an answer to. The government's brief doesn't engage with the hearsay argument that the defense raises. What's your best argument for why the statements related to Tovar-Duran's alienation, alienage and inadmissibility fall into the public records exception? I'd point this, and briefly, I know I'm over time, but to answer your question, I point the court to several cases, Hernandez-Rojas, Bahena-Cardenas, Contreras, Valdivinos-Mendez. There are other cases that establish that exactly these documents, the warning documents and the warrant, I-205, are admissible under that exception. And why it's not hearsay. This is not, the finding of alienage wasn't admitted for the truth of the matter asserted. There wasn't some separate finding or statements outside the document that this was offered for or that the judge relied on. If you look at those documents, and this is reflected at page 48 of the magistrate, of the record the magistrate judge is finding about these documents, they go to identity. They go to intent to enter the country illegally. They go to his specific intent to do so free from official restraint. And that's what those documents show. The fact that he had been removed, the judge could reasonably think, well, he doesn't have legal status here. He could be an alien. He was. The warning, he knows he can't re-enter for a period of 20 years. That goes to his mode of entry, and again, corroborates his identity and his statements. For the truth, and our case law says that we have to demonstrate that they were prepared or signed by persons with first-hand knowledge, and you missed that step. I would respectfully disagree because the certifications establish their authentication. These documents, this court time and time again has held it. They're hearsay, not authenticity. That's true. But to go, what this court's precedent reflects is that. What precedent are you talking about? I'm talking about cases like Hernandez-Rojas. What about United States v. Perlmutter? I'm sorry? What about United States v. Perlmutter, which is the case that Judge Wardlaw is asking about that clearly requires that the author of the public record have first-hand knowledge of the statements in the report? Yes. Did the government offer any evidence that the author of the I-205 had first-hand knowledge of the order of removal? I believe they do. And this would happen as. Okay, that's not sort of like just an arbitrary or abstract question. Where in the record does the government offer evidence that the author of the I-205 had first-hand knowledge of the order of removal? No, I don't believe that was in the record, and it's not necessary under this court's precedent. It wasn't necessary for them to do. What it offered was evidence that these are certified, authentic documents. That's required. It's the same as any business record, and we're talking about the public record's exception. Yes, and this is. Counsel, I think you're over time. You're three minutes over time, and you're not answering our questions. So I think we should do rebuttal at this point. Respectfully. And I could address Chu Cong-Yen if this court prefers to, but otherwise I can submit.   Okay, Ms. Agustin. Okay, so a few points. One is, as Judge Ward-Lung, I'm sure you're well aware, Bernal-Sanchez involved the same Henthorne checks. So the government in that case did do Henthorne checks. But at the time, like in Mr. Tovar-Duran's trial, the personnel files just weren't complete because investigations were ongoing. And second, I would say, as this court said in Bernal-Sanchez, any activity in the group would be impeaching given its racist and sexist contents. And so the government does have confirmed on remand in Bernal-Sanchez that it does have a limited universe of material about membership in I-1015 that does not go into personnel files. So I will also note the district court found that which agents were in the group were not initially at trial. That's at ER-12. Can I ask you a question about the hearsay issue? Yes. Assuming that we agree with you that some of the deportation documents contain inadmissible hearsay, can't the government rely on admissible portions of the documents to prove alienage? I think through, yes, if there were. So if this were jury trial, if there were redactions, obviously magistrate trial. Well, like the fact that he was previously deported. Yes, I don't think that is what happened here, but theoretically, yes. I'll say here the AUSA introduced the evidence and said it does reference him being an alien, so I think that would indicate the defendant's alienage. So I think in another trial, yes, that could be admitted. But in this one, that's not how it was admitted. If this court has no further questions, thank you. Okay, thank you. Mr. Horne, you may submit a letter brief, not to exceed five pages, explaining why the two documents, the warrant and the deportation notice, were not double hearsay, all right? I'll allow you to do that, do the research, look into the case that Judge Desai was raising for you and then submit something in writing to explain your position because I do think this is a, it's an important issue and we may have to clarify this. And I will give you the same thing. I'll do it by a week from today and just explain your position on that, all right? Thank you very much. Okay, United States versus Chobar, Duran will be submitted.
judges: WARDLAW, DESAI, ALBA